## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

|  |  |  |
|---|---|---|
| **LUTISHA IRENE BUSH,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **NANCY A. BERRYHILL,** | ) | **4:17-CV-1495-KOB** |
| **ACTING COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |

## MEMORANDUM OPINION

## I.  INTRODUCTION

On May 28, 2014, the claimant, Lutisha Irene Bush, applied for Supplemental Security Income benefits under Title XVI of the Social Security Act. The claimant alleged disability commencing on May 30, 2011, because of asthma, manic depression, tachycardia, post-traumatic stress disorder (PTSD), panic attacks, and a back injury. The Commissioner denied the claim on August 14, 2014, and the claimant filed a timely request for a hearing before an Administrative Law Judge (ALJ) on October 3, 2014. The ALJ held a video hearing on May 16, 2016. (R. 43, 148-53, 188).

In a decision dated August 23, 2016, the ALJ held that the claimant was not disabled, as defined by the Social Security Act, and was, therefore, ineligible for Social Security benefits. On June 29, 2017, the Appeals Council declined to grant review of the ALJ's decision, and the claimant has now appealed her decision to this court, which has jurisdiction pursuant to 42

1

U.S.C. §§ 405(g) and 1383(c)(3). (R. 40). For the reasons stated below, this court AFFIRMS the decision of the Commissioner.

## II.  ISSUES PRESENTED

The claimant presents the following issues for review:

1.  whether the ALJ properly evaluated the opinion of examining psychological consultant Dr. Hampton;

2.  whether substantial evidence supports the claimant's testimony regarding her symptoms;

3.  whether substantial evidence supports the ALJ's residual functional capacity finding that the claimant could perform light work;

4.  whether the ALJ properly did not apply Grid Rule 201.14, and properly relied on vocational expert testimony to support her finding that the claimant can perform light work; and

5.  whether the ALJ drew proper inferences from the claimant's lack of medical treatment.

## III.  STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if she applied the correct legal standards, and if substantial evidence supports her factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No…presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions,…but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

The ALJ must consider all medical opinions, but she is not required to give special deference to an opinion from a single consultation. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). However, refusal by the ALJ to accord proper weight to the opinion of a consultative

examining physician is cause for reversal. *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1268 (11th Cir. 2015).

In evaluating pain and other subjective complaints, the Commissioner must consider whether the claimant demonstrated an underlying medical condition, and *either* (1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). After the claimant has established an underlying medical condition, her disability determination must be based on evidence of the intensity, persistence, and functionally limiting effects of her pain or other symptoms, and the medical record. *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995). If the claimant testifies as to her subjective complaints of severe pain and other symptoms, the ALJ must articulate explicit and adequate reasons for discrediting the claimant's allegations of completely disabling symptoms. *Dyer*, 395 F.3d at 1210.

In making a disability determination, the ALJ is required to evaluate the claimant's residual functional capacity, which is an assessment based on all relevant evidence of the claimant's ability to work, despite her impairments. *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). The ALJ makes a proper residual functional capacity determination if she adequately considers the claimant's ability to "meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 416.945(a)(4).

If the findings of fact correspond with one of the grid rules, as set out in Appendix 2 of 20 C.F.R. part 404, subpart P, the Commissioner must find the claimant "disabled" or "not disabled" based upon a grid rule. *See* 20 C.F.R. Pt. 404 subpt. P, app. 2, § 200.00; 20 C.F.R. § 416.969. However, if the claimant has exertional *and* non-exertional limitations, the

Commissioner should use the grids as merely a framework in the decision-making process. *See* 20 C.F.R. § 416.969a(d). When the claimant's RFC does not exactly correspond with one of the grid rules, the ALJ may obtain the assistance of a vocational expert to determine any jobs the claimant could perform. *See Wolfe v. Chater*, 86 F.3d 1072, 1077-78 (11th Cir. 1996). "The ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Williams v. Barnhart*, 140 F. App'x, 932, 936 (11th Cir. 2005). The ALJ commits harmless error if she omits a factor from the hypothetical that would not change the testimony of the vocational expert. *Id.*

Refusal by a claimant to follow prescribed medical treatment without good cause will preclude a finding of disability. 20 C.F.R. § 404.1530(b). But Poverty may excuse failure to follow prescribed medical treatment. *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003). If the ALJ relies *solely* on a claimant's noncompliance as grounds to deny disability benefits, and the record indicates that the claimant could not afford prescribed medical treatment, the ALJ must make a determination regarding the claimant's ability to afford treatment. However, if the ALJ does not substantially or solely base her finding of nondisability on the claimant's noncompliance, she does not commit a reversible error by failing to consider the claimant's financial situation. *Id.*

## V.  FACTS

The claimant was fifty-two years old at the time of the ALJ's decision; obtained a GED and completed a certified nursing assistant (CNA) program; has past work experience as a CNA and a bonding agent; and alleges disability based on asthma, manic depression, tachycardia, PTSD, panic attacks, and a back injury. (R. 51, 62, 148, 179, 188-89).

*Physical and Mental Impairments*

The record includes extensive medical details regarding the claimant's back pain and migraines between 1991 and 1996. Although migraines were not listed on the claimant's social security benefits application, migraine-related complaints comprised the majority of the claimant's medical record until 2005. The claimant visited Dr. Kenneth Pilgreen and Dr. James White more than thirty times regarding migraines and back pain during this time. Dr. Pilgreen diagnosed the claimant with a common migraine with tension components in June of 1991, and he proscribed Corgard, Amitriptyline, and Midrin. The amount and type of medication that the claimant took, and the frequency of her migraines, fluctuated through the years. Dr. White also wrote the claimant's prescription for Midrin; gave the claimant a shot of Imitrex for her migraine headaches in 1993; and also conducted x-rays and CT scans at Gadsden Regional Medical Center of the claimant's lumbar spine that showed desiccation of the L5 intervertebral disc, early interspace narrowing, and mild bulging at L5. (R. 273-334).

The record indicates that the claimant visited Dr. Lisa Oestreich of Northeast Alabama Neurological Services once in 1999 complaining of migraines; and she visited Etowah Free Community Clinic once in 2002 and again in 2005 complaining of migraines. The record included no medical entries between 2005 and 2010, and the ALJ did not apply any facts before August 20, 2010, in making her determination. (R. 280-81, 325-28).

On August 20, 2010, the claimant presented to the emergency department of the Gadsden Regional Medical Center complaining of a right arm and shoulder injury. The claimant stated that the day before, a robber grabbed her at her workplace and threw her over a couch; her boyfriend who was in the office at the time killed the robber in self-defense; she had now calmed down enough to identify the pain in her upper right arm and shoulder; and she rated the pain as a

nine out of ten on the pain scale. Dr. Linda Jones conducted a physical examination of the claimant and determined that she had a ligamentous sprain in her right shoulder. Dr. Jones prescribed Motrin 800 mg, Ativan 1 mg, Lortab 500 mg/7.5 mg, and discharged the claimant approximately one hour after her arrival at the emergency department. Dr. Calvin Herring x-rayed the claimant's right shoulder the next day and opined that the claimant had chronic degenerative joint disease; developmental inferior tilt for the lateral aspect of the acromion, which is a bony protrusion on the scapula; and no acute finding. (R. 334-44).

Two weeks later, on September 3, 2010, the claimant returned to the Gadsden Regional Medical Center emergency department complaining of shoulder pain that was an eight out of ten on the pain scale. Dr. Djiby Diop x-rayed the claimant's shoulder and concluded that she had chronic degenerative joint disease. Dr. Diop stabilized the claimant, prescribed Demerol 50 mg, and discharged the claimant the same day. (R. 345-53).

On July 18, 2014, Dr. Ashley Hampton performed a mental status evaluation on the claimant at the request of the Disability Determination Service. Dr. Hampton noted that the claimant indicated significant pain in her back, left hip, and left leg; has a dry disc and a bulging disc; and was diagnosed with manic depression by Dr. Cleve Estes in 2000.[1] The claimant was born with asthma and drinks coffee instead of taking medication to control it. She has experienced several traumatic events in her lifetime, including molestation by a psychiatrist and two uncles as a child; physical and verbal abuse by her caretaker grandparents; and rape by a stranger as a teenager. She was also robbed at gunpoint and witnessed her boyfriend kill the assailant in self-defense in front of her in 2010. (R. 248-49).

The claimant told Dr. Hampton that she discontinued her PTSD mental services at CED Mental Health because she was paired with a young black male therapist who reminded her of

---

[1] The medical record did not include this diagnosis.

the man who robbed her. The claimant stated that she currently experiences nightmares and finds it hard to sleep for three to four days at a time; has a "hair trigger" after the robbery; has increased irritability and exaggerated startle response; and is not currently taking any medication, though she expressed interest in psychiatric medication if the medication could improve her symptoms. (R. 249-50, 254).

Dr. Hampton reported that the claimant was cordial, polite, easy to talk with, and relaxed in the interview; enjoyed the conversation; was cooperative; concentrated well throughout the exam; had limited immediate, recent, and remote memory; appeared to have normal thought content and thought processes; can understand simple directions; had intact judgment and insight; verbalized the importance of taking medications to prevent and alleviate pain; and was cooperative during the interview and appeared to answer all of the questions to the best of her ability. (R. 254).

Dr. Hampton noted that, other than "joking and cutting up" and talking faster sometimes, the claimant did not show any other symptoms that would support a bipolar diagnosis at this time. Dr. Hampton reported that the claimant has persistent nightmares and flashbacks; a persistent negative emotional state; difficulty concentrating; and persistent distorted thoughts. Dr. Hampton diagnosed the claimant with PTSD and found that the claimant "has significant psychological distress." Dr. Hampton reasoned that the claimant would have difficulty appropriately interacting with co-workers, supervisors, and the public; she opined that the claimant would benefit from talk therapy and psychiatric medications to improve her PTSD symptoms. Dr. Hampton concluded, "At this time, I do not believe it is possible for Ms. Bush to return to work." (R. 249, 254).

Dr. Sathyan Iyer performed a medical examination on the claimant on July 19, 2014, at the request of the Disability Determination Service. The claimant told Dr. Iyer that she has experienced lower back problems since 1993; had a previous myelogram that revealed a bulging disc; currently experiences constant pain; has pain when bending and walking and takes over- the counter medicines to help with the pain; has skipped heartbeats; experiences headaches; has asthma and shortness of breath but cannot afford inhalers; does not sleep well; and suffers from PTSD, anxiety, and panic attacks. Dr. Iyer noted that the claimant currently does not take any prescription medication for these ailments. Dr. Iyer indicated that the claimant has a full range of motion of her neck and right shoulder; left shoulder abduction of one hundred degrees, which is less than normal; full range of motion in her elbows and wrists; normal grip strength and thumb opposition functions; normal muscle power of the upper extremities; intact cranial nerves; no motor or sensory deficits; a negative Romberg's sign, which indicates normal balance; and deep tendon reflexes. (R. 257-59).

Dr. Iyer concluded that the claimant has lower back pain with restricted range of motion, possibly secondary to underlying degenerative joint disease of the lumbar spine; has a history of chronic anxiety disorder; is not currently taking medication; has tendinopathy of the left shoulder; and has a history of asthma. According to the range of motion chart, the claimant's dorsolumbar spine movement was limited, but the chart indicated all other ranges of motion were normal. Dr. Iyer concluded, after examining the claimant and reviewing her medical history, that the claimant could have impairment of functions involving bending, lifting, carrying, pushing, pulling, and overhead activities; asthma could impair certain functions, such as working in extreme temperature or in dusty conditions; but the claimant has no other physical limitations. (*Id.*).

On July 21, 2014, Dr. Brian Valentine x-rayed the claimant's lumbar spine at Quality of Life Health Services, Inc.[2] The x-ray revealed a disc collapse at L5 and mild posterior atrophy at L4-L5. (R. 263).

On August 14, 2014, the state agency psychiatrist, Dr. Estock, reviewed the claimant's medical history but did not personally examine her. Dr. Estock determined that the claimant has a medically determinable impairment, but the impairment does not satisfy the diagnostic criteria of Listing 12.06. Dr. Estock concluded that the claimant had moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation. (R. 83).

The claimant presented to CED Mental Health Center five times between February 3, 2015, and June 19, 2015, to address her bipolar disorder, tachycardia, and daily coping. At the initial intake interview with Yvonne Cooper, a mental health counselor, the claimant complained of not sleeping; PTSD; panic attacks; seeing shadows; being depressed or down most of the day, nearly every day, for the past two weeks; a lack of interest in activities she used to enjoy; persistent irritability; spells or attacks of suddenly feeling anxious, frightened, uncomfortable, or uneasy in situations in which most people would not feel that way; feeling anxious in a crowd; persistent fear in the past month of being watched, the focus of attention, humiliated, or embarrassed; recurrent thoughts, impulses, or images that were unwanted, distasteful, inappropriate, intrusive, or distressing over the past month; recently experiencing a traumatic event and re-experiencing the event in a distressing way; responding to trauma with intense fear, helplessness or horror; believing that people were spying on her or plotting to hurt her; having visions when awake and seeing things others cannot see; and being excessively anxious or

---

[2] The record does not indicate who requested x-ray.

worried about routine things over the past several months. The claimant also stated that she was currently off her medication. On March 31, 2015, Dr. Richard Grant, at CED Mental Health Center, diagnosed the claimant with bipolar disorder with psychosis and PTSD. (R. 365, 369, 371-75).

The claimant called to postpone her July 24, 2015, CED Mental Health Center therapy session, and then she did not appear for her rescheduled August 28, 2015, appointment. On the telephone, the claimant complained of a negative reaction to her current meds, and she agreed to follow up on the state of her medication at her next appointment. (R. 359).

The claimant returned to CED Mental Health Center on September 28, 2015, and October 2, 2015, and saw Dr. Grant. Dr. Grant reported that the claimant's diagnoses included severe Bipolar I disorder; panic disorder; PTSD and that the claimant is not currently taking any other medications because she was prescribed Zyprexa for her depression, anxiety, and insomnia. The claimant reported an increase in her symptoms because her granddaughter, who had been living with her, was taken away by the Department of Human Resources; an increase in irritability; and weight loss. The claimant was a no-show for her November 23, 2015, appointment with her therapist at CED Mental Health Center, and she did not answer her telephone. (R. 354-57).

On March 15, 2016, the claimant visited Quality of Life Health Services, Inc. complaining of a cough, nasal congestion, rhinitis, rhinorrhea, and hoarseness. The claimant rated her pain as a zero out of ten on the pain scale. Certified registered nurse practitioner Raymond Doty evaluated the claimant and found she was oriented to time, place, person, and situation; her affect and mood were appropriate; she had normal insight and judgment; and he diagnosed the claimant with acute bronchitis. Mr. Doty completed tobacco cessation counseling with the client; prescribed her Promethazine for her cough and other symptoms; and told her to

increase her fluids and return to the clinic if her condition did not improve in two weeks. (R. 381-83).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insured benefits, the claimant requested and received a hearing before an ALJ on May 16, 2016. At the hearing, the claimant testified that she worked as a CNA at McGuffey Healthcare from February 2000 until February 2001; at Turenne Investments in 2002; as a bonding agent from September 2010 through February 2012; and then briefly at Western Sizzlin in 2015. As a CNA, the claimant testified that she bathed residents, changed their clothing, changed their bedsheets, and frequently bent and stooped as part of the job. (R. 61-64).

The claimant testified that she smokes a half pack of cigarettes per day, has never tried to stop smoking but has cut down, and her son buys her cigarettes. She cannot get along well with other people; seldom leaves the house; is scared all of the time; goes to the bank and grocery store only if someone goes with her because she will experience panic attacks; experiences daily panic attacks; cannot sit or stand for more than fifteen minutes because she has been diagnosed with hyperesthesia and has a dry disc and a bulging disc in her back; cannot lift over ten pounds, according to Dr. White; has asthma; has insomnia; experiences migraine headaches approximately once per month that last anywhere between one day and two weeks; and cannot watch a two-hour movie and follow the plot. (R. 64-70).

The claimant testified that she drives her son to work in her car; can climb a set of stairs if she holds onto a railing; can use her knees to stoop or squat if she has help getting back up; can grip a coffee cup or open a door knob; can sometimes feel with her fingertips; can pick up things like a pen or paper; can bathe, dress and make food to eat; and can sweep, but needs help

mopping and vacuuming. The claimant also testified that CED Mental Health treated her for depression and PTSD with therapy and medication, but she has stopped both the treatment and medication because the therapy was not helping, and she was allergic to the medication and could not afford it. (R. 65-71).

A vocational expert, Joe Mann, testified concerning the type and availability of jobs that the claimant is able to perform. Mr. Mann testified that the claimant's past work was as a nurse assistant, classified as a semiskilled, medium exertional level position; counter attendant, classified as semiskilled, light work; and skip tracer, which he classified as semiskilled, sedentary work. The ALJ asked Mr. Mann to assume a hypothetical individual with the same age, education, and prior work history as the claimant that could lift twenty pounds on an occasional basis and ten pounds on a frequent basis; sit for at least six hours during an eight-hour workday, stand and walk a combination of a least six hours during an eight-hour workday; frequently climb ramps and stairs; occasionally climb ladders, ropes or scaffolding; frequently stoop, kneel, crouch and crawl; can only complete simple tasks; and seldom interact with coworkers and supervisors. Mr. Mann opined that the hypothetical individual could not perform any of the claimant's past work, but she could perform a wide range of light, unskilled work, including as a hand inspector, with 30,000 positions in the national economy and 1,000 estimated positions in Alabama; a sorter, with 100,000 positions in the national economy and 2,000 estimated positions in Alabama; a shipping, receiving weigher, with 36,000 positions in the national economy and 800 estimated positions in Alabama. (R. 71-74).

The ALJ next provided Mr. Mann with the same hypothetical but added that the individual would be off task at least twenty percent of the workday. Mr. Mann replied that the individual would not be able to maintain a full-time competitive job of any kind if she was off

task at least twenty percent of the workday. Mr. Mann also stated that such individual would not be capable of performing these positions if her impairments caused her to miss more than two days per month or made her unable to interact with either coworkers or supervisors. (R. 74).

*The ALJ Decision*

On August 23, 2016, the ALJ found that the claimant was not disabled under the Social Security Act. First, the ALJ found that the claimant had not engaged in substantial gainful activity since May 28, 2014, the application date. (R. 45, 52).

Next, the ALJ found that the claimant has the severe impairments of asthma, bipolar disorder, and degenerative joint disease. However, the ALJ found that the claimant's PTSD, chronic anxiety disorder, depression, and panic disorder were non-severe impairments. (R. 45).

The ALJ then found that the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ specifically found that the claimant did not meet the criteria for Listing 12.04, regarding mental impairment. In making her determination, the ALJ relied in part on the opinion of Dr. Estock. She reasoned that because the claimant's mental impairments only included mild and moderate difficulties instead of marked difficulties, the claimant's mental impairments were not severe. (R. 46-47).

The ALJ next determined that the claimant cannot perform her past relevant work, but does have the residual functional capacity to perform light work except that she can lift, carry, push, or pull twenty pounds occasionally and ten pounds frequently; sit, stand, or walk, each for six hours in an eight hour day; frequently climb ramps, stairs, stoop, kneel, crouch, and crawl; occasionally climb ropes, ladders and scaffolds; understand, remember and carry out routine tasks; and can occasionally interact with coworkers, supervisors, and the public, but cannot

engage in teamwork activities. In making her determination, the ALJ "considered all symptoms" and "considered opinion evidence." (R. 47).

The ALJ relied on the claimant's testimony, as well as the opinions of Dr. Hampton[3] and Dr. Iyer. The ALJ noted that the claimant indicated that she will only go on errands or shop when she has someone to go with her, but she daily drives her son to and from his workplace. She said she is able to grip a coffee cup or doorknob, but occasionally has numbness in the fingertips of her right hand. She said she could climb stairs if she has a railing to hold onto, but she cannot bend over or squat. The ALJ also pointed out that the claimant has not taken her medication; visited the doctor infrequently in the past few years given her alleged level of pain; and failed to appear at multiple therapy appointments. (R. 48-51).

The ALJ gave "limited weight" to consultative psychologist Dr. Hampton's conclusion that the claimant could not work. She opined that not all of Dr. Hampton's observations were internally consistent. The ALJ noted that Dr. Hampton concluded that the claimant could not work well with supervisors, coworkers and the public, but described the claimant as cordial, polite, and easy to talk with. Furthermore, the ALJ opined that Dr. Hampton never explained how the claimant's lack of concentration would prevent her from engaging in light work. The ALJ ultimately found Dr. Hampton's observations to be inconsistent with her conclusion. (R. 49).

The ALJ gave "significant weight" to consultative physician Dr. Iyer's opinion. The ALJ outlined Dr. Iyer's diagnoses of low back pain and restricted range of motion; degenerative joint disease of the lumbar spine; history of chronic anxiety disorder; tendinopathy in the left shoulder; and history of asthma/chronic obstructive pulmonary disease. She also noted Dr. Iyer's statement that the claimant was not currently on medication. (*Id.*).

---

[3] At times in the decision, the ALJ mistakenly referred to Dr. Hampton as "Dr. Hamilton."

The ALJ stated that x-rays of the claimant's right shoulder on August 21, 2010, indicated chronic degenerative joint disease, but no acute finding. Furthermore, she opined that when the claimant visited Gadsden Regional Medical Center on September 3, 2010, her condition was stable and improved. The ALJ also pointed out that Quality of Life Health Services medical records from March 15, 2016, demonstrate that the claimant reported her pain was a zero out of ten on the pain scale; her psychiatric orientation was oriented to time, place, person, and situation; her mood and affect were appropriate; and she had normal judgment and insight. (*Id.*).

The ALJ noted that no treating source submitted a medical source statement on the claimant's behalf, and no treating or examining source has suggested functional limitations greater than the above residual functional capacity assessment mark. Thus, the ALJ concluded that the claimant was not disabled as defined under the Social Security Act and that sufficient jobs existed in the national economy based upon the vocational expert's testimony. (R. 51).

## VI. DISCUSSION

### *Issue 1: The ALJ's Assessment of Dr. Hampton's Opinion*

The claimant argues that the ALJ did not properly evaluate Dr. Hampton's consulting opinion. The court disagrees. The ALJ is not required to give special deference to an opinion from a single consultation. *See Lewis*, 125 F.3d at 1440. In addition, opinions, such as whether a claimant is disabled, "are not medical opinions,…but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case." 20 C.F.R. §§ 404.1527(d), 416.927(d). Dr. Hampton's opinion that the claimant could not work was not a medical opinion and, therefore, not entitled to any special weight.

The ALJ pointed out omissions in Dr. Hampton's analysis, such as the fact that Dr. Hampton never described how the claimant's lack of concentration would prevent her from

engaging in light work. The ALJ also pointed to discrepancies in Dr. Hampton's analysis, such as her finding that the claimant could not interact appropriately with coworkers or the public while simultaneously reporting the claimant to be "cordial, polite, and easy to talk with." Dr. Hampton also reported both that the claimant has "difficulty concentrating" and that the claimant "concentrated well throughout the exam." (R. 49, 249, 251).

Furthermore, although the ALJ attributed "limited weight" to Dr. Hampton's conclusion that the claimant could not work, she did integrate aspects of Dr. Hampton's opinion that were consistent with the medical record into her decision. For example, the ALJ found that the claimant could only understand, remember, and carry out simple and routine tasks; have occasional contact with coworkers and supervisors; only have occasional contact with the public; and could not engage in teamwork type activities. These findings stemmed from Dr. Hampton's opinion and were consistent with other medical evidence. (R. 46-47).

The ALJ is permitted to give "limited weight" to the opinion of a consultative physician. Furthermore, the ALJ examined the record and provided valid reasons supported by substantial evidence. Therefore, the court finds that the ALJ did not err in according "limited weight" to Dr. Hampton's consultative opinion.

### Issue 2: Evaluation of the Claimant's Testimony

The claimant also argued that the ALJ did not properly evaluate the claimant's testimony regarding her pain. This court finds that the ALJ properly discredited the claimant's testimony.

The ALJ is permitted to discredit the claimant's subjective testimony as long as she articulates her reasons for doing so. *See Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause symptoms, the claimant's allegations regarding the

intensity, persistence, and limiting effects of these symptoms were not fully consistent with the evidence. The ALJ reached her conclusion only after thoroughly explaining the claimant's testimony and comparing it with that of the medical record.

The ALJ pointed to a March 15, 2016 Quality of Life Health Services report showing that the claimant characterized her pain as a zero out of ten on the pain scale; Dr. Iyer's consultative report; a Gadsden Regional Medical Center x-ray from August 21, 2010, indicating chronic degenerative joint disease but no acute finding; the claimant's multiple no-shows to CED Mental Health Center; the fact that no treating source submitted a medical source statement on the claimant's behalf; infrequent trips to the doctor over the past decade given the level of pain alleged; and a lack of both objective evidence verifying the claimant's testimony regarding her pain and medical evidence supporting the claimant's testimony. The ALJ properly articulated her reasons for discrediting the claimant's pain and characterization of her physical capabilities; substantial evidence supports her decision. (R. 49-51).

*Issue 3: The Claimant's Ability to Perform Light Work*

The claimant next contends that substantial evidence does not support the ALJ's finding that the claimant can perform light work, because the ALJ's finding was conclusory and without supporting evidence. The ALJ makes a proper residual functional capacity determination if she adequately considers the claimant's ability to "meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 416.945(a)(4). This court finds that the ALJ adequately considered the appropriate factors in making her determination.

In this case, the ALJ supported her determination that the claimant could perform light work only after analyzing the claimant's medical and nonmedical evidence in the record. The ALJ first determined whether the claimant had any medically determinable physical or mental

impairments, and then, after establishing that the claimant did have impairments, she examined whether the underlying impairments could reasonably be expected to produce the claimant's symptoms or pain. In reaching her conclusion, the ALJ "considered all symptoms" and "also considered opinion evidence." The ALJ analyzed in detail the claimant's testimony; the opinion of the claimant's consultative psychologist, Dr. Hampton; the opinion of the consultative physician, Dr. Iyer; the opinion of the state psychiatrist, Dr. Estock; and past medical records from Gadsden Regional Medical Center, Quality of Life Health Services, and CED Mental Health Center. (R. 46, 49-50).

The ALJ evaluated the claimant's complaints and resolved inconsistencies between the complaints and the medical record. The claimant testified that she could not walk, stand, or sit for more than twenty minutes at a time because of pain. However, the ALJ pointed out the claimant's infrequent trips to the doctor given the level of alleged pain; a visit to Quality of Life Health Services on March 15, 2016, in which the claimant reported her pain as a zero out of ten on the pain scale; and the opinion of consultative physician, Dr. Iyer, who found that the claimant had normal range of motion in all areas other than in the dorsal lumbar spine and left shoulder. (R. 48-50).

The ALJ supported her conclusion directly and thoroughly with evidence from the record, and substantial evidence supports her residual functional capacity determination.

*Issue 4: Application of Grid Rule 201.14 and Veracity of the Vocational Expert Testimony*

The claimant further argued that the ALJ erred in failing to apply Grid Rule 201.14 to the claimant, and that the ALJ erred in relying on a vocational expert hypothetical that did not include all of the claimant's impairments. Again, the court disagrees.

The ALJ found that the claimant could work at the light exertional level with additional non-exertional limitations. If a claimant has non-exertional limitations, the ALJ can use the grids as merely a *framework* in the decision-making process. *See* 20 C.F.R. § 416.969a(d). When the claimant's residual functional capacity does not exactly correspond with one of the grid rules, as is the case here, the ALJ should obtain the assistance of a vocational expert to determine if jobs exist that the claimant can perform on a full-time basis. *See Wolfe v. Chater*, 86 F.3d 1072, 1077-78 (11th Cir. 1996). The ALJ properly viewed the grid rules as a framework and was correct in relying on vocational expert testimony in reaching her decision.

During the hearing, the ALJ presented two hypotheticals to the vocational expert. The first hypothetical contained an individual with a similar age, education, prior work history, and physical and mental limitations as the claimant. The second hypothetical was the same, except for the addition of residual psychiatric symptoms, such as panic attacks, that would cause the claimant to be off task at least twenty percent of the workday. (R. 72-74).

The claimant argues that the ALJ committed reversible error by relying on the first hypothetical instead of the second in reaching her conclusion. The record does not support the fact that the claimant would be off task more than twenty percent of the workday because of her bipolar disorder or her headaches. The record indicates that the claimant has not visited a doctor or hospital complaining of significant headaches or migraines since 2005. Although the claimant mentioned headaches to Dr. Iyer, the consultative physician, and testified that she gets about one migraine per month to the ALJ, she did not describe the severity of those migraines or express concern that they would prevent her from working.

The ALJ listed bipolar disorder as a severe impairment, but after examining the claimant's entire medical record, she found that the claimant's bipolar would not prevent her

from performing light work with non-exertional limitations. The ALJ permissibly relied on the first hypothetical because the record does not demonstrate that either the claimant's headaches or bipolar disorder would have changed the vocational expert's answer that the claimant could perform certain non-exertional light work. Therefore, the ALJ did not commit reversible error by relying on the vocational expert's first hypothetical instead of the second one. (R. 48-51, 257-59, 325-27).

*Issue 5: Inferences from a Lack of Medical Treatment*

The claimant additionally argued that the ALJ drew improper inferences based upon a lack of medical treatment. The claimant argues that she could not afford treatment, did not have medical insurance, and the ALJ "failed to develop the record on the issue." The court disagrees.

As long as the ALJ does not substantially or solely base her finding of nondisability on the claimant's noncompliance or lack of medical treatment, she does not commit a reversible error by failing to consider the claimant's financial situation. *See Ellison*, 355 F.3d at 1275. Here, the ALJ relied on many factors in concluding the claimant was not disabled, such as the claimant's visit to the doctor in March 2016 in which she indicated her pain was zero out of ten on the pain scale; Dr. Hampton's statement in the mental evaluation in which she described the claimant as "cordial, polite, and easy to talk with;" Dr. Iyer's physical evaluation in which the claimant had a normal physical examination other than an inability to walk on heels and tiptoes and a limited range of motion of the dorsal lumbar spine and left shoulder; the claimant's decision to continue smoking half a pack of cigarettes daily; and the claimant's non-compliance with mental health therapy. (R. 49-50).

The sparse medical treatment was only one of several arguments the ALJ made regarding the claimant's medical treatment; therefore, the ALJ did not commit reversible error regarding the claimant's lack of medical treatment issue.

## VII.    CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is due to be AFFIRMED.

The court will enter a separate Order in accordance with the Memorandum Opinion.

DONE and ORDERED this 21st day of September, 2018.


_____
**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE